Slip Op. 16-28

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TIANJIN WANHUA CO., LTD., <br><br>       Plaintiff, <br><br>     v. <br><br>UNITED STATES, <br><br>       Defendant. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 14-00183 |

**OPINION**

[Final results of administrative review sustained.]

Dated: March 29, 2016

  David J. Craven, Riggle and Craven of Chicago, IL for Plaintiff Tianjin Wanhua Co., Ltd.

  Peter J. Koenig, Ludmilla Savelieff, and Nicholas Galbraith, Squire Patton Boggs of Washington, DC for Plaintiff Shaoxing Xiangyu Green Packing Co., Ltd.

  John D. Greenwald, Jonathan M. Zielinski, and Thomas M. Beline, Cassidy Levy Kent (USA) LLP, of Washington, DC for Plaintiff-Intervenors DuPont Teijin Films China Limited, DuPont Hongi Films Foshan Co., Ltd., and DuPont Teijin Films Hongji Ningbo Co., Ltd.

  Jane C. Dempsey, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. On the brief with her were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director and David F. D'Alessandris, Trial Attorney. Of counsel on the brief was Michael T. Gagain, Attorney, Office of the Chief Counsel for International Trade for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

  J. Michael Taylor, Stephen A. Jones, and Mark T. Wasden, King & Spalding LLP of Washington, DC for Defendant-Intervenor Terphane, Inc.

Ronald I. Meltzer, Patrick J. McLain, David M. Horn, and Jeffrey I. Kessler, Wilmer, Cutler, Pickering, Hale and Dorr, LLP of Washington, DC for Defendant-Intervenor Mitsubishi Polyester Film, Inc. and SKC, Inc.

Gordon, Judge: This action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering polyethylene terephthalate film, sheet, and strip from China. See Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, 79 Fed. Reg. 37,715 (Dep't of Commerce July 2, 2014) (final results admin. review) ("Final Results"); see also Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review on Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, A-570-924 (Dep't of Commerce June 24, 2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-15574-1.pdf (last visited this date) ("Decision Memorandum"). Before the court are Plaintiff Tianjin Wanhua Co., Ltd.'s ("Wanhua") and Consolidated Plaintiff Shaoxing Xiangyu Green Packing Co., Ltd.'s ("Green Packing") USCIT Rule 56.2 motions for judgment on the agency record. Mem in Supp. of Mot. for J. on the Agency R. Submitted By Pl. Tianjin Wanhua Pursuant to R. 56.2 of the Rs. of the U.S. Ct. of Int'l Trade, ECF No. 46 ("Wanhua Br."); Pl. Shaoxing Xiangyu Green Packing Co., Ltd. R. 56.2 Mem. for J. on the R., ECF No. 48 ("Green Packing Br."); see also Reply to Resp. of Def. United States to Mot. for J. on the Agency R. Submitted by Pl. Tianjin Wanhua Pursuant to R. 56.2 of the Rs. of the U.S. Ct. of Int'l Trade, ECF No. 68; Reply Br. of Pl. Shaoxing Xiangyu Green Packing Co., Ltd., ECF No. 70. Plaintiff-Intervenors DuPont Teijin Films China, Limited, DuPont Hongji Films Foshan Company, Limited, and DuPont Teijin Films Hongji Ningbo Company, Limited join

in support of the Rule 56.2 Motions for Judgment on the Agency Record filed by Wanhua and Green Packing. See Statement in Lieu of USCIT R. 56.2 Mot. 1-2, ECF No. 47. Defendant responds opposing Wanhua and Green Packing's Rule 56.2 motions. Def.'s Resp. to Pls.' R. 56.2 Mots. for J. on the Agency R., ECF No. 51 ("Def.'s Resp."); Defendant-Intervenors Mitsubishi Polyester Film, Inc. and SKC, Inc. respond in support of the Final Results. See Def.-Intervenors' Br. in Opp. to Pls.' Mots. for J. on the Agency R., ECF No. 58. Defendant-Intervenor Terphane, Inc. confirms that it agrees with and incorporates the arguments made by Defendant in its response to Plaintiffs' Rule 56.2 motions. See Letter in Lieu of Resp. Br. 1, ECF No. 57. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

Wanhua challenges Commerce's surrogate country selection and decision to deduct value added tax ("VAT") from Wanhua's export price. Green Packing also challenges the surrogate country selection, as well as Commerce's surrogate valuation for recycled polyethylene terephthalate chip ("PET chip") without applying Green Packing's proposed by-product offset. For the reasons set forth below, the court sustains the Final Results on each issue.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2015). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Jane C. Bergner, Steven W. Feldman, the late Edward D. Re, and Joseph R. Re, 8-8A, West's Fed. Forms, National Courts § 13342 (5th ed. 2015).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A.,

555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

When reviewing substantial evidence issues from non-market economy proceedings involving Commerce's selection of the "best available" pricing and cost data from "surrogate" economies/companies, 19 U.S.C. § 1677b(c), the court's "duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)); see also Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1379 (Fed. Cir. 2015); CITIC Trading Co. v. United States, 27 CIT 356, 366 (2003) ("[W]hile the standard of review precludes the court from determining whether [Commerce's] choice of surrogate values was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."); Dorbest Ltd. v. United States, 30 CIT 1671, 1675-76, 462 F. Supp. 2d 1262, 1269-70 (2006) ("The term 'best available' is one of comparison, i.e., the statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping margin. . . . This 'best' choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data.").

## II. Discussion

### A. Exhaustion

Wanhua challenges Commerce's decision to adjust Wanhua's U.S. prices to account for Chinese VAT as contrary to 19 U.S.C. § 1677a(c)(2)(B). Wanhua Br. at 11-13. Green Packing challenges Commerce's selection of Indonesia as the primary surrogate country, arguing that the South African data for the most important input was superior to the Indonesian data when measured against Commerce's announced selection criteria. Green Packing Br. at 10-12. Neither Wanhua nor Green Packing raised these arguments in their administrative case briefs. See Case Br. of Tianjin Wanhua Co., Ltd. 17-18 (Dep't of Commerce Feb. 12, 2014), PD 255 (presenting a factual argument against export price adjustment but no legal argument); Case Brief of Shaoxing Xiangyu Green Packing Co., Ltd. (Dep't of Commerce Feb. 11, 2014), PD 254 (stating that "South Africa has the best quality of data, as compared to the others" and Commerce "should use South Africa as the surrogate country in the final determination" without any further elaboration or citation to the record). Defendant urges the court to disregard these arguments as unexhausted. Def.'s Resp. at 10-11, 25-28.

The court agrees with Defendant that requiring exhaustion is appropriate in these circumstances. The U.S. Court of International Trade must require exhaustion of administrative remedies "where appropriate." 28 U.S.C. § 2637(d). "This form of non-jurisdictional exhaustion is generally appropriate in the antidumping context because it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review—advancing the twin purposes of protecting

administrative agency authority and promoting judicial efficiency." Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 88-90 (2006)). The court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

An important corollary to the exhaustion of administrative remedies is Commerce's own regulatory requirement that parties raise all issues within their administrative case briefs. 19 C.F.R. § 351.309(c)(2) (2015) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the final determination."); Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008) (parties are "procedurally required to raise the[ir] issue before Commerce at the time Commerce [is] addressing the issue"). This requirement works in tandem with the exhaustion requirement and promotes the same twin purposes of protecting administrative agency authority and promoting judicial efficiency.

Both Wanhua and Green Packing had the opportunity during this proceeding to raise their arguments in their case briefs, and both chose not to do so. By declining to develop or argue these issues, Wanhua and Green Packing signaled that neither issue warranted attention from Commerce. In so doing, Wanhua and Green Packing undermined Commerce's ability to analyze both issues in the Decision Memorandum and in turn deprived the court of a fully developed record on the contested issues. Furthermore, Commerce's regulatory requirement that parties raise all issues within their

administrative case briefs carries the force of law, and the court cannot simply ignore it. Exhaustion is therefore appropriate.

Wanhua asserts in a footnote that the "pure question of law" exception to the exhaustion requirement applies here. Wanhua Br. at 11 n.2. There is no merit in this argument. First, the court does not entertain substantive arguments raised in footnotes. Am. Tubular Prods., LLC v. United States, 38 CIT ___, ___, Slip Op. 14-116 at 25-26 (2014) (citing SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006); see also Calvert v. Wilson, 288 F.3d 823, 836 (6th Cir. 2002) (explaining that courts generally consider arguments raised in footnotes to be waived, and citing sources); City of Emeryville v. Robinson, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010) (deeming an issue waived where the party "fail[ed] to address the issue in its opening brief except in a footnote"). Second, the court simply notes that the pure question of law exception is just not likely to apply in this context. It only might apply for a clear statutory mandate that does not implicate Commerce's interpretation of the statute under the second step of Chevron. See, e.g., Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1032 (Fed. Cir. 2007) (applying pure question of law exception to Chevron step 1 issue). Even when the statute is clear, however, it is always preferable to have the agency's interpretation of the statute it is entrusted to administer set forth on the administrative record. See 2 Richard J. Pierce, Jr., Administrative Law Treatise § 14.3 (5th ed. 2010) (describing the primary jurisdiction doctrine and its relationship to Chevron); see also Agro Dutch, 508 F.3d at 1029 n. 4 (noting that Commerce had opportunity to, and did, put forth its interpretation on administrative record in two instances). In this case the statute

does not define the phrase at the center of Wanhua's legal challenge. See 19 U.S.C. § 1677a(c)(2)(B) (using the phrase "export tax, duty or other charge imposed" without clarification). The pure question of law exception therefore cannot apply in this instance because its application would undermine the very purposes the exhaustion requirement is designed to promote. See Fuwei Films (Shandong) Co. v. United States, 35 CIT ___, ___, 791 F. Supp. 2d 1381, 1384-85 (2011).

To conclude, the court does not reach Wanhua's unexhausted challenge Commerce's decision to adjust Wanhua's U.S. prices to account for Chinese VAT as contrary to 19 U.S.C. § 1677a(c)(2)(B) and Green Packing's unexhausted challenge to Commerce's surrogate country selection. Each of those matters is sustained.

### B. Surrogate Country Selection

In an antidumping duty administrative review, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (the price of the goods sold in the United States) and the normal value of the merchandise. 19 U.S.C. §§ 1675(a)(2)(A), 1677b(a). In the non-market economy context, Commerce calculates normal value using data from surrogate countries to value the factors of production. Id. § 1677b(c)(1)(B). Commerce must use the "best available information" in selecting surrogate data from "one or more" surrogate market economy countries. Id. § 1677b(c)(1)(B), (4). The surrogate data must "to the extent possible" be from a market economy country or countries that are (1) "at a level of economic development comparable to that of the nonmarket economy country" and (2) "significant producers of comparable merchandise." Id. § 1677b(c)(4). Commerce

has a stated regulatory preference to "normally . . . value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2).

When choosing among potential surrogate countries that are at a level of economic development comparable to the non-market economy country and are significant producers of comparable merchandise, Commerce evaluates the relative availability and reliability of surrogate value data sourced from each potential country. Commerce is guided by a general regulatory preference for publicly available, non-proprietary information. 19 C.F.R. § 351.408(c)(1), (4). Beyond that, Commerce generally considers the quality, product specificity, and contemporaneity of the available surrogate value data. Decision Memorandum at 3, 6-7.

The administrative record below included surrogate data for each factor of production sourced from two economically comparable significant producers of comparable merchandise: Indonesia and South Africa. Id. at 6-7. Commerce chose Indonesia, explaining that the Indonesian financial surrogate data "pertain to the production of identical merchandise, while the South African [data] pertain to the production of only comparable merchandise." Decision Memorandum at 13-14.

Wanhua challenges Commerce's selection of Indonesia over South Africa. Specifically, Wanhua argues that Commerce's failure to reject the sole Indonesian financial surrogate, PT Argha Karya Prima Industry, Tbk ("Argha"), is inconsistent with past practice. According to Wanhua, Argha's annual report is incomplete under Indonesian law, and Argha probably enjoyed the benefit of "broadly-available non-industry-specific export subsidies." Wanhua Br. at 4-9. Wanhua insists that

Commerce has a stated practice of rejecting incomplete annual reports, id. at 5-6 (citing Wire Decking from the People's Republic of China, 75 Fed. Reg. 32,905 (Dep't of Commerce June 10, 2010) (final LTFV determ.); Lightweight Thermal Paper from the People's Republic of China, 73 Fed. Reg. 57,329 (Dep't of Commerce Oct. 2, 2008) (final LTFV determ.); Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, 73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008) (final LTFV determ.)), as well as those sourced from subsidized companies, id. at 8 (citing Certain Frozen Warmwater Shrimp from the People's Republic of China, 72 Fed. Reg. 52,049 (Dep't of Commerce Sept. 12, 2007) (final results admin. review).

In the court's view, although this particular surrogate value selection is not without its issues, Commerce did not act inconsistent with past practice when it used Argha's financial statement. To clarify Commerce's actual practice, Commerce has rejected incomplete financial statements of potential surrogate companies because those statements did not include data necessary for calculating financial ratios. Here, however, as Commerce explained, the record includes a complete financial statement from Argha contained within an incomplete annual report:

> Wanhua argues that the Department needs a complete annual report on the record in order to calculate surrogate financial ratios. Wanhua cites three antidumping duty administrative reviews in support of its argument. However, the Department agrees with Petitioners that Wanhua has failed to support its claim that Argha Karya's financial statements are incomplete. First, in Wire Decking/PRC (2010), the Department was faced with partial financial statements (not a partial annual report) from an Indian producer that did not include key data necessary to calculate SVs. Specifically, the financial statements did not contain schedules A through D accompanying the balance sheet. Thus, the Department was unable to calculate surrogate financial ratios. In this case, Argha Karya's financial statements include the

>schedules necessary for the calculation of surrogate financial ratios. Second, in Thermal Paper/PRC (2008), the Department declared a set of financial statements incomplete because they did not include a fixed asset schedule. The fixed asset schedule is necessary as it supports the Department's use of a depreciation expense in its calculation of financial ratios. Argha Karya's financial statements on the record of the instant review include this schedule. Third, in OTR Tires/PRC (2008), the Department disregarded certain financial statements from the calculation of surrogate financial ratios because the financial statements did not contain the auditor's statements, extensive data on the income statement, and accompanying schedules, or were not legible. Argha Karya's financial statements on the record of this administrative review include an auditor's statement, the income statements are complete, the necessary schedules (as previously stated) are present, and the financial statements are legible.

Decision Memorandum at 11 (footnotes omitted). Unlike the administrative decisions Wanhua cites in its brief, Argha's financial statement contains all the data necessary for calculating financial ratios. Id. Commerce therefore reasonably distinguished this case from other instances in which it rejected incomplete financial statements. See id.

As the court noted above, however, the incomplete annual report is not without its issues. As Wanhua explains,

>The annual report was not complete, missing a substantial portion of the report. The record, as shown by the table of contents of the Argha annual report, indicates that the Argha annual report was missing pages 1 through 78. (Exhibit SVSI-1 to Wanhua's Resubmitted Surrogate Values for the Final Results, PD 228 at bar code 3178117-02, page 8 (Feb. 3, 2014).) The Department acknowledges that an annual report in Indonesia is required to contain multiple documents discussing the operations of the company. (Def. Resp. at 7.) The Government of Indonesia considers such information of sufficient relevance that it requires that it be included in all annual reports. (Rule Number X.K.6: Obligation to submit Annual Report for Issuers of Public Companies as provided as part of Exhibit SVSI-4 to Wanhua's Resubmitted Surrogate Values for the Final Results, PD 230 at bar code 3178117-04, pages 12-20 (Feb. 3, 2014).) These points are not in dispute.

Wanhua Reply Br. at 3. Wanhua further explains that it was the domestic interested parties that submitted the incomplete document. Id. Commerce appears to have given the domestic interested parties a pass, not following up or inquiring about the missing pages of the annual report, e.g., asking where and how it was obtained, why the pages were missing, or requiring the domestic interested parties to supply a complete version.

There is a further difficulty with the Argha annual report. Commerce has a general policy of disregarding import prices from Indonesia (as surrogate values for input prices) because Commerce has found in other proceedings that Indonesia maintains broadly available, non-industry specific export subsidies. Decision Memorandum at 11-12. Commerce makes a general inference "that all exports to all markets from Indonesia may be subsidized," and Commerce consequently "disregards import prices from Indonesia." Id. at 12 (emphasis added). Wanhua argues that Argha is primarily an export-oriented business, and given Commerce's general inference "that all exports to all markets from Indonesia may be subsidized" Commerce should have reasonably inferred that subsidies likely tainted Argha's operations. Wanhua Br. 8-9. Commerce sidesteps this problem by noting that Commerce is utilizing financial data from an Indonesian company, not import prices of goods from Indonesia into some other country, and that nowhere in the incomplete Argha annual report is there any reference to a subsidy. Decision Memorandum at 11-12. Wanhua questions the reasonableness of Commerce's inference, from an incomplete annual report, that Argha did not benefit from subsidies. Wanhua Br. at 9.

This is a good argument. The Argha annual report has obvious issues that test the reasonableness of its selection as the best available information to calculate Wanhua's margin. The court notes, however, that the question ultimately is not whether the incomplete Argha annual report in isolation is a good or bad surrogate value selection, but more specifically, whether Commerce's choice of that data set is reasonable (supported by substantial evidence) when compared with the other available data sets. Dorbest, 30 CIT at 1675-76, 462 F. Supp. 2d at 1269-70 ("The term 'best available' is one of comparison, i.e., the statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping margin. . . . This 'best' choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data.").

Turning to the data set that Wanhua favors, the South African AstraPak's financial statement was also a suboptimal choice. Whereas Argha produced "identical" merchandise, AstraPak produced "comparable" but not identical merchandise. Decision Memorandum at 13-14. Wanhua, unfortunately fails to address this deficiency, devoting all its energies on the disadvantages of the Argha annual report. See Wanhua Br. at 9-10; Wanhua Reply Br. at 1-5. Missing is an analysis of the consequence of "comparable" vs. "identical" merchandise on the margin calculation, e.g., what complexities or difficulties would or would not be engendered. So although the court may agree that the Argha annual report has weaknesses as a surrogate dataset, the court cannot evaluate those weaknesses against the noted weaknesses of the AstaPak dataset because Wanhua did not provide any comparative analysis. This is important. For the

court to remand for Commerce to use the AstraPak dataset, Wanhua needed to establish that AstraPak, when compared with Argha, is the one and only reasonable surrogate selection on this administrative record, not simply that AstraPak may have constituted another possible reasonable choice. <u>Globe Metallurgical, Inc. v. United States</u>, 36 CIT \_\_\_, \_\_\_, 865 F. Supp. 2d 1269, 1276 (2012) (substantial evidence review "contemplates [that] more than one reasonable outcome is possible on a given administrative record"). The court therefore must sustain Commerce's surrogate dataset choice.

### C. PET By-product

As described above, Commerce in non-market economy cases uses data sourced from a surrogate country to value a respondent's factors of production. 19 U.S.C. § 1677b(c)(1)(B). Factors of production include raw material inputs utilized to manufacture the subject merchandise. <u>Id.</u> § 1677b(c)(3). Commerce typically assigns a surrogate value to recycled inputs like it would any other raw material input. <u>Decision Memorandum</u> at 16. Commerce's policy, though, is to avoid double counting by offsetting the cost of production by the value of recycled inputs (or the value of by-product sold) when a respondent demonstrates that the cost of its recycled inputs are already accounted for elsewhere. <u>Id.</u> at 19.

Wanhua uses recycled PET as an input to produce the subject merchandise, which Commerce valued as it would any other factor of production. During the period of review, however, Wanhua recovered some PET by-product material from its own production of subject merchandise. Wanhua sold some of that PET by-product and reintroduced some into later production runs. Wanhua requested that Commerce offset the surrogate value

for the recycled PET input to account for the fact that it used some of its own recycled PET as the input. Wanhua supported its request with internal records detailing specific quantities of sold and reintroduced PET by-product. After considering Wanhua's submissions, Commerce granted Wanhua's requested offset. Issues and Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review on Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, A-570-924, at 24-25 (Dep't of Commerce Dec. 18, 2013), <u>available at</u> http://enforcement.trade.gov/ frn/summary/prc/2013-30919-1.pdf.

Like Wanhua, Green Packing captures PET by-product materials created during the manufacture of subject merchandise. Like Wanhua, Green Packing claims that it sells some of that by-product and uses some of that by-product as an input to produce the subject merchandise. But unlike Wanhua, Green Packing did not provide Commerce with <u>any</u> information to substantiate its claims about how the recycled PET chip it produces relates to the recycled PET chip it used to manufacture the subject merchandise. As a result, Commerce selected a surrogate value for Green Packing's recycled PET chip input but declined to grant Green Packing an offset. <u>Decision Memorandum</u> at 21-25.

Green Packing now challenges Commerce's treatment of Green Packing's recycled PET chip input as unreasonable. Green Packing's main argument is that Commerce double counted the cost of the recycled PET input, since the recycled PET chip input is a by-product of the manufacturing process. Green Packing asserts that Commerce should have either assigned a zero value to the recycled PET input or granted a by-product offset to avoid this double counting. In support of its position, Green Packing

points to DuPont Teijin Films China Ltd. v. United States, 38 CIT ___, 7 F. Supp. 3d 1338 (2014) ("DuPont"), a decision that rejected Commerce's explanation for applying a surrogate value to an input obtained from earlier production runs without also granting an offset.

The court does not agree that Commerce should have assigned a zero to Green Packing's recycled PET chip input. As Commerce explained below, Green Packing did not provide any details regarding the quantities of recycled PET chip that it produced and reintroduced as an input. Commerce could not in the absence of such detail "exclude the reintroduced PET chips from its NV calculation (or assign a zero value to them) on the basis that they are completely balanced out by the recyclable PET waste by-product generated." Decision Memorandum at 16-17. As Commerce explained, "[t]here is no record evidence to indicate that the quantity of reintroduced PET chips will be equivalent to, or closely match, the recyclable PET waste by-product generated during any given period." Id. Green packing also listed recycled PET chip as an ingredient necessary to produce the subject merchandise, meaning that assigning a zero to that input would, as Commerce noted, "be equivalent to removing that input altogether from the calculation of [normal value]." Id. at 17.

Green Packing also argues that the manufacturing overhead surrogate value accounts for its recycled PET chip input. Commerce explained, however, that the manufacturing overhead is a percentage applied to the total cost of all raw material inputs. The overhead cost therefore only accounts for recycled PET chip to the extent that recycled PET chip is included in the total raw material cost. As Commerce detailed below:

> The Department calculates overhead by multiplying the surrogate overhead ratio by a respondent's cost of manufacturing, which is comprised of raw materials, labor, and energy. Therefore, the overhead ratio is applied to all three components of the cost of manufacturing. Even if the labor and energy expenses associated with Respondents' recycling process have been reported, overhead would be understated if the overhead ratio is not multiplied by the total value of all of the materials used in production, including the reintroduced PET chips. This is why the Department, in calculating a respondent's overhead costs, must determine SVs for all inputs, including recycled inputs such as reintroduced PET chips.

Decision Memorandum at 18. Consequently, in the court's view, Commerce reasonably assigned a non-zero surrogate value to Green Packing's recycled PET chip input.

As for Green Packing's proposed offset, the court agrees with Green Packing that in certain circumstances the only accurate way to account for by-product reintroduced as an input into later production runs may be to offset the cost of production by the amount of by-product used. This is exactly what Commerce did for Wanhua. Unlike Wanhua, though, Green Packing chose not to paper the record with evidence to substantiate its request for an offset. "The interested party that is in possession of the relevant information has the burden of establishing . . . the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1) (2015); see also QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("'[T]he burden of creating an adequate record lies with [interested parties] and not with Commerce.'" (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992))). Here, Green Packing simply asserted, without evidentiary support, that the amount of by-product produced and the amount of by-product re-entered into production process were, without exception, the same figure. In the court's view, Commerce reasonably concluded that Green Packing

failed to demonstrate that it was entitled to a by-product offset. Decision Memorandum at 21-23.

The court notes that DuPont does not compel a different outcome here. In DuPont, Commerce applied a surrogate value to the recycled PET input for the first time in the final results. The court in DuPont provided Commerce with the choice on remand of either assigning zero for the recycled PET input surrogate value or offsetting that value so as to "reasonably avoid[]" double counting. DuPont, 38 CIT at ___, 7 F. Supp. 3d at 1344-48. Commerce opted for the latter methodology. DuPont Teijin Films China Ltd. v. United States, 39 CIT ___, ___, Slip Op. 15-19 at 2-3 (2015). Here, unlike DuPont, Commerce applied a surrogate value to Green Packing's recycled PET input in the preliminary determination. Green Packing consistently declined Commerce's invitations to provide information that would enable Commerce to calculate an appropriate offset. Decision Memorandum at 21-23. Commerce therefore reasonably concluded that Green Packing did not demonstrate its entitlement to an offset.

Lastly, the court does not see any merit in Green Packing's challenge to the surrogate value Commerce ultimately selected for the recycled PET chip input. As explained above, the input in question is recycled PET chip, not PET waste film. Commerce used the average value of imports under Indonesian HTS 3907.60.90, which covers both primary PET chip and PET scrap that is transformed into primary form. Decision Memorandum at 19-20. Green Packing's proposed alternative, Indonesian HTS 3915.10, by its own terms only applies to waste products. Commerce therefore

reasonably selected Indonesian HTS 3907.60.90, which as Commerce explained was more specific to the recycled PET chip input in question. Id. at 20.

### III. Conclusion

For the foregoing reasons, the court sustains Commerce's application of a VAT adjustment to Wanhua's export price, Commerce's surrogate country selection, and Commerce's surrogate valuation of Green Packing's recycled PET chip input. Judgment will be entered accordingly.

                                                                               /s/ Leo M. Gordon
                                                                         Judge Leo M. Gordon

Dated: March 29, 2016
       New York, New York